Good morning, your honors, and please the court. My name is Walter Shetley. I represent the appellants. Mr. Day and Mr. Kailoa are here. Mr. Popohuli was on the mainland, and Mr. Kahawai-Ola'a has difficulty traveling. He's on the Big Island. I'd like to take a few minutes of my time, if the court will indulge me, to go back and look at the big picture, the big perspective. The Native Hawaiians, like Native Americans, were dispossessed from their land wrongly. The only difference is that the United States did it with respect to the other Native Americans, and the Kingdom of Hawaii did it with respect to Native Hawaiians. Now that we're in statehood, and it went to a popular vote of the people, I take it that it's part of the union. I'm not challenging annexation. I'm just stating the fact that... Let's take it like it is. In the course of becoming a state, certain agreements were entered into between the Kingdom and the United States government, approved by the Senate. That's what we're looking at, isn't it? Yes, that's what I'm getting to, Your Honor, and I would like to see those agreements enforced. I'd like the court to look back at the big picture here. Now, Native Hawaiians were deprived of their land by the Kingdom, and the state of Hawaii has the land now. But in between time, the United States recognized that problem and did something to address it. They enacted the Hawaiian Homes Commission Act, and the purpose of the Hawaiian Homes Commission Act was to rehabilitate the Native Hawaiians, that is the Native Hawaiians of the blood, not less than one-half part, and put them back on the land. That was in 1920, the Hawaiian Homes Commission Act, 1922. In 1959, barely anything had been done to enforce that or implement that act. So there were only a couple thousand people that had gotten homesteads. At that point in statehood, the United States said, again, we have to do something about this. And what they did was, they gave the state all of the land, but they said, what you have to do is you have to implement that Hawaiian Homes Commission Act. And we're going to put that in as a requirement of statehood, Section 4 of the Admissions Act. Not only that, but we're going to impose a trust on all of the 5F land, all of the land we're giving to the United States, and one of the purposes of that trust is to better the condition of Native Hawaiians. Now, over the years, this court has said, well, looking only at 5F, the state has no obligation to do anything for Native Hawaiians. Wait a minute, 5F imposes some accounting restrictions, right? Direct accounting restrictions. Excuse me? Doesn't 5F impose on the state some specific accounting requirements? I don't know if that's what you're referring to, Your Honor. It says that the land and proceeds and income therefrom have to be used for one or more of the following purposes. And then it lists five purposes. And it says, as provided by state law. And then it says any other use is a breach of trust for which the United States can bring suit. And this court has held also Native Hawaiians can bring suit. But my point is that even though this court has indicated on several occasions that 5F by itself doesn't require the state to do anything in particular for Native Hawaiians, if you look at 5F in connection with 5B and Section 4, the state has to do something to better the condition of Native Hawaiians. And that is to implement the Hawaiian Homes Commission Act. That was what Congress said in 1959. That is not the only item that they can make an expenditure for, though, is it? No. No, they can use it all up on some other items that are within the statute, and they just get down to the end and they still don't have any money for Homestead. They're breaching Section 4. What specific part of Section 4 are you referring to? I'm looking at Section 4. What specifically is it? Well, it says that as a compact with the United States, management of the Hawaiian homelands, the Hawaiian Homes Commission Act, shall be adopted as a provision of the Constitution of the state. So the state has to implement the Hawaiian Homes Act. And in Section 5B, they gave the land, that is the homelands, to the state subject to 5F. Section B says that what they're giving them includes the available lands. So if they're going to use 5F for only one of the five purposes, that one purpose has to be to better the condition of Native Hawaiians. They cannot completely ignore the condition of Native Hawaiians. In spite of this, they did. For another 20 years, from 1959, 1978, 19 years, still nothing was done to better the condition of Native Hawaiians. All of the income and proceeds from 5F were put into the general fund and used for the purpose of supporting public schools. This history is in Yamasaki, Oaha versus Yamasaki. And the Hawaiian Supreme Court says, in 1978, we had a constitutional convention. And the constitutional convention said, hold it, we have to do something to better the condition of Native Hawaiians. And we're going to do something. And what we're going to do is we're going to establish OHA. And we're going to give OHA a portion of the 5F income and proceeds. And they're going to have to use that to better the condition of Native Hawaiians as defined in the Hawaiian Homes Commission Act. That's what we're complaining about here. So your complaint has to do with the definition of Native Hawaiian at bottom. My complaint has to do with the fact that OHA has been ignoring the definition. Well, let me be sure I understand your complaint. I understand. Is the portion of the, what OHA gets and administers is the 20% allocation. Is that correct? They get a pro rata portion. And they're arguing about what that is. But they get a portion. Okay, I'm just trying to trace this through. You've given us the setup under 5F. 5F, as Judge Beeser pointed out, has five permissible expenditures. There's the betterment clause that specifically calls out Native Hawaiians. And he posited that if all of the money, and you're suggesting it was in the past, is allocated to one of the other of the five, in this case public education, you said, that the trustees are obligated to spend some money under the betterment clause of 5F. And OHA was created after 5F came into existence. So are you saying that whatever OHA does has to be spent only in fulfillment of the betterment clause? That's what I'm saying. Okay, so does that mean that it has to be spent only on Native Hawaiians, or it can be spent primarily for the benefit of Native Hawaiians? Is it to the exclusion of anybody else? In other words, it has to be purely for Native Hawaiians? It can't have any indirect benefits? I'm having trouble understanding exactly where the argument gets at that point. What I'm saying is that under 5F, it says that they have to spend that money, that income and proceeds, for those purposes as provided by state law. State law says that the money that OHA gets from that trust has to be spent only for the betterment of the condition of Native Hawaiians. And I'm willing to concede, under that provision of the trust, that they can spend it on things that primarily benefit Native Hawaiians and have incidental benefit to Hawaiians as well. I'm not saying that it has to be only spent for those beneficiaries and can't provide a benefit to anybody else, but I'm saying that the primary benefit has to be for the beneficiaries. All right, now does that mean OHA, just let me be sure I understand. Okay, so as long as we're talking about OHA functioning, the money spent under 5F that are run through OHA is a delegation, if you will, to the state to define how at least some of the funds that derive from these public lands trusts are to be spent. And state law defines it, at least insofar as OHA is concerned, as has to be in implementation only of the betterment clause. Yes. And that even though they might be spending it for public education, it can only be public education for the benefit of Native Hawaiians. That wouldn't be public education, I would submit. Public education is the public and not limited to Native Hawaiians. Well, if it's for spending it to send them to the University of Hawaii. Yes. If it granted them funds to go, you know, a scholarship or whatever, why wouldn't that be for a public education, education in a public school? It would benefit the University of Hawaii, presumably. But it would be for the benefit of Native Hawaiians, would it not? I think that they can do that. OHA can spend money to send Native Hawaiians to school, but I don't think that that would be considered a support of public education. Counsel, there were, as I took it, four expenditures that you're challenging specifically in this complaint. And I'm sorry, I'm not able to speak more clearly today. Could you go through those one by one and tell me why they are not primarily for the benefit or the betterment of Native Hawaiians and why a reasonable OHA could not make that conclusion? Three of them are essentially the same. That's an item. That's issue B, C, and D. That's the Native Hawaiian Legal Corporation, the PUA Education Program, and Aluliki. No, no, those three, yes. Those three are essentially the same. The issue that raised on the appeal is whether the contributions to those entities benefit Native Hawaiians. Because the issue is whether a contribution of trust funds to those entities without restriction as to blood quantum is a breach of trust established by 5F. So that's what caused me to ask the question I asked you much earlier, which is isn't this an argument about the blood quantum and the definition of who's sufficiently Hawaiian to receive this money? Yes, that's what the whole case is all about, is the blood quantum. But anyone who meets the definition that you want also meets the definition for these entities, do they not? No, no. All of these entities provide services to Hawaiians without regard to blood quantum. Right, and so people with more blood quantum by definition would... I represent Hawaiians that have the blood quantum, that are not less than one-half part, that are beneficiaries under 5F. If there is a .001 bottom that people who are 50% or above by definition are within that group, are they not? Yes. Okay. Yes, and do you account for them? Excuse me? Is there any accounting for those expenditures? Well, that's the objection that we're making is there's no accounting, that there is no accounting. Have they received any benefit? Who? Native Hawaiians. Are you saying no native Hawaiian has received any money from the trust? I don't know. All I know is, on this record, that they have given trust money to three entities that provide benefits to non-beneficiaries as well as beneficiaries. And what the entities have done with it, they could have spent all of the money on native Hawaiians, and they could have spent all of the money on non-native, I mean, Hawaiians with less than one-half part. They could have spent some of it on one and some of it on the other. We do not know. I am saying that by giving the money to an entity that is not restricted to the blood quantum, they have breached the trust because there is no accounting. I understand your argument. Could you briefly say why the Native Hawaiian Government Reorganization Act of 2007, the Akaka Bill expenditures related to that, categorically could not be considered for the betterment of native Hawaiians? Well, I don't think that it can categorically be determined to be for their benefit. On this record, we have their justification for it is on page 23 of the answering brief. And they say that the bill, if passed, Akaka Bill, if passed, native Hawaiians would be benefited in the following ways. One, the preservation, development, and transmission to future generations of native Hawaiians with a capital N, their lands, and native Hawaiians with a capital N, political and cultural identity in accordance with their traditions, beliefs, customs, practices, language, and social political institutions. Two, the control and management of their own lands, including ceded lands. And three, the achievement of greater self-determination over their own affairs. Furthermore, the Akaka Bill provides process within the framework of federal law for native Hawaiian with a capital N people to exercise their inherent rights as a distinct indigenous native community to reorganize a single native Hawaiian governing entity for the purpose of giving expression to the rights of native people, self-determination, self-governance. They're trying to establish a government for native Hawaiians without regard to blood quantum. And this is not a benefit to the small number of actual beneficiaries. This is a benefit that goes to all Hawaiians. There are 400,000 Hawaiians. There are only, at most, 80,000 native Hawaiians. They are trying to establish a government which will get the money that they are accumulating and not spending for the betterment of the condition of native Hawaiians. It is their goal to set up... Now, and this is... I mean, if this happens, it will be the next suit. Because it is also a violation of equal protection. It's a racial pacification without a blood quantum. With a blood quantum, it can be justified on a knowledgeous basis to the Indian tribes. Without a blood quantum, Judge Breyer in Rice said, he'd never heard of an Indian tribe without a blood quantum. Without a blood quantum, sooner or later, every single person on this globe will be a native Hawaiian. Well, we don't yet know what's going to happen to them, correct? We know. We can tell. At least the evidence shows that they're headed that way. We all know that legislation isn't legislation until it's enacted. So the question is whether going in the direction of self-governance, similar to that of an Indian tribe, it is permissible. We would have no objection to self-governance similar to an Indian tribe. In fact, my clients tried to do that in Cahavaiola versus Norton. They said we should be entitled to apply for titles and recognition under the Indian Reorganization Act, which excludes Hawaiians from the agreement. The reason that the current bill is there is that that route was unsuccessful. Under the Indian Reorganization Act, you start out with not less than one-half. And it's up to the tribes to determine the quantum, blood quantum. Counsel, you have about a minute and a half if you'd like to say something. This is extremely important, Your Honor. It's up to the tribes to determine the blood quantum on their own. And what they want to do here is have this entity, which has no blood quantum, establish a blood quantum, which they won't. Why would somebody who doesn't have one-half part say that the blood quantum should be one-half part and I'm excluded? If you start out with no blood quantum, there's not going to be a blood quantum. If you start out with a blood quantum, 50%, and let those people decide, well, it should be expanded. It's our land under the Hawaiian Homes Commission Act. It's our property under the OHA Trust. If we want to expand the definition, we can do that. That's the way you work it with the tribes, the other Native Americans. This bill doesn't do that. This bill is unconstitutional. This bill is trying to deprive Native Hawaiians of their lands. It is of no benefit to Native Hawaiians. Thank you. Thank you, Counsel. Good morning. Again, Robert Klein representing the trustees of the Office of Hawaiian Affairs. Mr. Mark Bennett, the state's attorney general, is present to argue for the state. And I'd like to yield him eight minutes of my time, if possible, so he can make those arguments. Mr. Shotley's clients filed a federal lawsuit based on alleged violations by the Office of Hawaiian Affairs of the Federal Admissions Act. The Office of Hawaiian Affairs, Your Honors, is a state agency and a trust that was established in 1978 to carry out the purposes laid out in the Admission Act that the state underwent when it accepted the ceded lands as part of the act of admission for Hawaii to become a state. Also in the Admission Act, as you know from previous arguments, the Hawaiian Homestead Commission Act of 1921 was also required to be adopted by the state. Those two trusts, the Hawaiian Homes Trust, the Ceded Lands Trust, those are really the crown jewels of the Admission Act for the Hawaiian people. In order to succeed in this lawsuit, Mr. Shotley will have to prove that the use by the OHA trustees of their considerable discretion and latitude in how to use ceded lands revenues was abused by them such that the constitution of the laws of the United States were violated and he could bring a claim under Section 1983 of the U.S. Code. I think the claim, the reason I asked some of the questions I did is that I think that his claim is somewhat narrower than what you just described in that he's challenging, I thought it was four things, he said it's kind of a group on one side, a group of three, and then the support of the OCACA bill. So isn't that the only issue that's presently before us, whether those specific expenditures were in violation of law? Judge Scraper, that's exactly right. There may be other things that the trustees have done wrong, who knows, but it seems to me that as it reaches us, it's only those expenditures that are being challenged. Well, I don't think the trustees have done anything wrong, for sure, but as far as those four programs are concerned, there can be no doubt that those programs are funded by the trustees of OHA for the purposes of at least bettering the condition of Native Hawaiians. But as I understand his theory, to step back before we get to the output, it's the income that comes in and OHA, this is not being a Hawaiian and having the background other than through the cases that you all have presented to us. I'm having some difficulty tracing the flow here to see exactly what the OHA trustees and their mission and their limits are. Under 5F, there was no OHA. Correct. Okay, at best, not at best, but what it did is laid out a source of these funds and it provided that those funds were to be used for five purposes, one of which is the betterment, but only one of which is explicitly for the betterment of Native Hawaiians. Now, OHA comes along, and if I look at OHA, it gets its funds to administer through apparently two different sources, one of which is this 20% clause that comes in and says they get 20% of a source of funds, and that appears under the OHA enabling statute, to specifically say that those funds are to be spent for the betterment of Native Hawaiians. Is that correct? Yes. And what they're challenging is saying, okay, whatever the state of Hawaii generally can do, OHA is required under state law to spend the money that it's getting for the betterment of Native Hawaiians, and you can't get there, under his theory, if you simply say, well, we're going to make benefits available, programs available to all Hawaiians, and they're a subset of all Hawaiians, and therefore, they may get some benefit. Some statistical distribution will mean that some of them, and their theory is no, you have to go out and spend the money on Native Hawaiians, and then others can benefit, but there's no doubt that it's at least principally for the benefit of Native Hawaiians. The question here, what I want to address, before we get to whether these expenditures come within that ambit, is how does the state law mandate on OHA wind up as part of the Federal Admissions Act? Well, in other words, their theory, as I understand it, is they are asserting the right under 5F, which is a federal law, which they can then say is being violated by OHA in carrying out the trust obligations imposed by 5F. Why isn't that a 1983 suit for violation of federal law? Well, it certainly isn't because federal law, the Admission Act, gives the state great latitude in how to carry out the purposes of the trust. Well, but the state has, in fact, carried it out, and it is specified that the OHA trustees are supposed to spend the money that they get, at least under the 20% clause, for the benefit of Native Hawaiians. Well, I guess my point is a little finer than that, Judge Fischer. It's how you carry out the mission of bettering the condition of Native Hawaiians. Does that mean, as you stated, I think, correctly, Mr. Shotley's argument, that every cent that OHA receives from the Ceded Lands Trust has to be spent directly, solely, and only for the benefit of Native Hawaiians directly by making expenditures? Well, is there any language to the contrary? Pardon me? That's exactly what the language requires the trustee to do. I beg to differ. I don't think there is any language in the Admission Act that says anything about solely. Does 5F require you to account for the funds you receive and their disbursement? There's no accounting requirement under Section 5F. Does common law trust retire a trustee to account for the trust assets that are in their hands? I think in a private trust situation... What's wrong with a public trust? Well, public trusts are even treated under Ninth Circuit case law differently than private trusts. I mean, it's just a gift to the state, not to a special group or for the benefit of a group. The lands that came to the state under the 5F trust, that statehood, were impressed with five purposes, one of which was the betterment of the condition of Native Hawaiians. How that was to be accomplished was not specified, and most private trust instruments would have the beneficiaries clearly delineated, the trust purposes delineated, and the trust responsibilities. Doesn't the trust delineate the beneficiaries as Native Hawaiians, and doesn't the corpus of the trust be an amount set at 20% of the income? The 20% is not in the Admissions Act. It is in, as Judge Fischer says, the enabling legislation passed by the legislature when it created OHA. Yes, but 5F says, I thought you just said, it's up to the state to decide how the trustees are to carry out, and the state has made that decision, and it says, such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the Constitution and laws of said state may provide. And their use for any other object shall constitute a breach of trust for which suit may be brought by the United States. So the question I'm wrestling with, at least, is when you say that it's up to the state to decide, the state has decided to a portion of the funds, and has decided those 20% funds are to be spent, if we read 5F, for the betterment of Native Hawaiians. That's one of the purposes, and if it's spent for anything else, as defined by state law, it's a breach of trust, and they can bring suit under 5F. Sure. The question really is, how do you better the condition of Native Hawaiians if you're a trustee and you have broad discretion to do so? Mr. Shotley is saying those funds have to be used by OHA directly, solely, and only, as I say, for the betterment of the condition of Native Hawaiians. If you look at the four examples that he gives in his complaint, support for the Akaka Bill, for example, he makes a lot of dire predictions about it, but OHA spending money to support the Akaka Bill, and in the end of the day, if Hawaiians achieve a political relationship with the United States government, then certainly programs like the Hawaiian Homestead Program, which does benefit Native Hawaiians, have the opportunity to be protected against 14th Amendment challenges, due to the fact that there would be a political relationship between the United States and the Hawaiian people. So, there is a benefit to the Native Hawaiian people for OHA to spend money to pursue the Akaka Bill. The benefit is their very existence as Native Hawaiians is at stake by passing that bill. Counsel, it looks to me, from looking at the state statute that describes the purposes of OHA, it seems to distinguish, as the plaintiffs do, between Native Hawaiians and all Hawaiians. But it also seems to me that it expressly permits many things on behalf of Hawaiians, as well as Native Hawaiians, including advocacy efforts, and the betterment of conditions for all Hawaiians. Exactly right. So, it seems to me that it's a little bit ambiguous, actually, how the statute, what they're really trying to say, what they're really trying to accomplish. Well, just to clarify, because I want to make sure I'm not a misunderstanding, it says, Section 10-13-5 says, Use of public land trust proceeds. 20% of all funds derived from the public land trust described in Section 10-3 shall be expended by the offices defined in Section 10-2. For the purposes of this chapter, if you go to 10-3, it lists six things, all of which are the purposes, and many of them relate to, Section 1 is the betterment of Native Hawaiians, Section 2 is the betterment of Hawaiians, which I take to mean two different groups. Yes, correct. Okay, I take that point, but then it says one of the purposes is the betterment of conditions of Native Hawaiians. A pro rata portion of all funds derived from the public land trust shall be funded in an amount to be determined by the legislature for this purpose. Yes. Okay, now is the 20% the determination as to what shall be allocated to Clause 1? Because if that's true, then the 20% is limited, as I understand it, to what 10-3 Clause 1 provides. In other words, is the amount to be determined by the legislature, has the legislature determined that 20% of the funds are going to go to the betterment of Native Hawaiians? The legislature has set out in another section that you rely on a pro rata portion of the ceded land's income that goes to the Office of Hawaiian Affairs, and you correctly point out that that's one of the uses of that 20%. No, okay, but I guess there are, as Judge Graber points out, there are other, the betterment of conditions of Hawaiians is Clause 2, or subsection 2. Yes. What I'm trying to understand, your position, is does OHA understand that the 20% funds are to be limited to the betterment of conditions of Native Hawaiians? They've got other funds that they may get. I think OHA understands that. I guess the bottom line question is how do you accomplish that as a trustee? So at least we have agreement, just to be sure I understand, that from OHA's trustees' point of view, the money that is at stake here is the proper disposition of the 20% funds that are to be spent for the betterment of Native Hawaiians, and then the question is in carrying that out, are the trustees adequately doing what they should in their discretion to make sure that the use of those monies is not just for the betterment of Hawaiians generally, but are specifically for the betterment of Native Hawaiians, which may in turn have some benefits for a broader class of people, but there's no doubt that what they are deciding on each one of these expenditures is they look at them to see if they are definitely for the betterment of Native Hawaiians. Yes, Your Honor. Okay. I would make two points. Number one, if the plaintiffs do have a concern about OHA violating state law, they're in the wrong court. They should be in state court. But why isn't it, if I take that point, but then now my question is if 5F, we trace it back to what everything is being carried out in 5F, which is a federal law, federalizes through its delegation of whatever the authorization to the state to define the activities of the trustees, why is that not in that part a federal as well as a state mandate? The state law defines what the 5F contemplates state law will define. Therefore, if they aren't carrying out what the state law says, then it's a violation of 5F. Well, I think that's certainly one way to trace it all the way back, but I think you need perhaps to listen to the attorney general talk about how the state spends money to implement the 5F trust responsibilities. And I would also say if you look at the price case, this court has stated fairly clearly that in the Hawaiian referendum issue when OHA sought to spend money to take a referendum to decide how Hawaiian people felt about this very divisive 50% blood quantum issue, the plaintiffs sued and the Ninth Circuit said if there's an incidental benefit to non-native Hawaiians, non-50%ers, that is not a misuse of the ceded lands trust funds. I understand the price case. What I'm trying to understand is do you, does OHA bottom line say insofar as the 20% funds as your trustees carry out their mission, they say in this category of funds we are looking at the betterment of conditions of native Hawaiians. The question is now as we exercise our discretion, that's our guiding principle. Are we doing that? Not that they are somehow incidentally affected, but they are the primary. Judge Fischer, if you look at every program that Mr. Shotley complains about, he can't point to one of the programs where native Hawaiians, 50%ers, aren't benefited by those programs. To what extent and how do we know? Pardon me? To what extent and how do we know? I would submit to you that there is nothing in the record to show that these funds are used other than for the betterment of native Hawaiians. It's Mr. Shotley's duty to show how. It's the trustees' duty to show. The trustees have made, Judge Bieseck, they've made on the record a showing that the Akaka Bill will serve native Hawaiians. It will. Yes, if passed. If passed. Mapua No'eau is a program that serves kindergarten through 12 native Hawaiians and non-native, non-50%ers. Equally, it's cultural. It's to develop educational programs at the University of Hilo, a public institution,  including those of protected ahupua'a tenants, kuleana rights, Hawaiian culture, Hawaiian practices, customs. That's where they spend their money, to protect Hawaiian interests. There's no question about that. So 20% gets commingled with a whole bunch of other money, right? Well, I wish it were a whole bunch of other money, but that's not quite true. Well, that's the balance of the funds that you hold in trust. The balance of the funds that are held in trust. 20%. The balance of the funds that OHA has in its trust are devoted specifically to the purposes under the state statute to benefit all Hawaiian people, including native Hawaiians. That's a decision made by the trustees in their discretion. I think Judge Marley got it correctly right, and there is no case law to the effect that what Mr. Shockley is talking about that underlies the 1983 action is clear law that the trustees would have to follow. I'd like to yield some of my few seconds. We don't really have much, but we have taken a lot of your time, so we'll give Mr. Bennett five minutes to tell us what his position is. Mahalo. Thank you, Your Honor. May it please the Court. My name is Mark Bennett, and I'm the Hawaii Attorney General. The state of Hawaii is the Admission Act trustee. The state of Hawaii spends far more on permitted Admission Act objects like public education than it receives in revenue generated by the public trust lands. This was an undisputed fact below. We established it at Clerk's Record 143 and our Supplemental Excerpts of Record 1 through 29. We established that we spend $2 to $2.5 billion every year on public education. We receive from the ceded land trust perhaps $100 or so million every year. So we spend, on one of the permitted Admission Act purposes, 15 to 20 times what we receive in revenue from the public trust lands. But, Mr. Attorney General, I have a problem with that argument. As Judge Deeser has pointed out, where's the accountability? What you're saying basically is we get so much money and spend so much money, and they're a minuscule amount of the total funds available. We spend it all on public education. Public education can benefit Native Hawaiians. OHA does not have to account. It could spend money willy-nilly, however, that the whole $100 million could go off onto non-Native Hawaiian type of expenditures and wouldn't make any difference because they're getting the benefit of the overall spending by the state. So end of case. I find that hard to accept. Well, that's not our argument. Okay, good. Our argument is that in order to establish a 1983 action, a plaintiff, an individual plaintiff, as opposed to the United States, an individual plaintiff has to show that the trustee is breaching the Admission Act. The Admission Act does not require that money be spent on Native Hawaiians as opposed to public education, or for that matter, public education as opposed to Native Hawaiians. This court said in the 1990 Price case there are no accounting requirements on the state. This court said that specifically. I believe actually Judge Deeser was a member of the panel that said that, and it was very clear, it was very explicit, 921S2 at 955-56. The state's only obligation under the Admission Act with regard to revenue, which is fungible, as opposed to the land itself, which isn't. In this case, it's about revenue. The state's only obligation under the Admission Act with regard to revenue, federal obligation, is to spend more than it receives. Now, let's come back to what the OHA Trustees Council has suggested. That is, under 5F, there is, in effect, a definition of the uses of funds allocated to the state. That is, the permissible uses. The state of Hawaii has enacted a statute that says 20% of the funds that OHA gets are to be administered specifically for the benefit of Native Hawaiians. That's what they're arguing. Now, why is that not traceable back into 5F as a violation of the trust obligations of the state through its own laws, and you can't defend OHA on the basis that they're somehow able to spend money without regard to accounting for it being spent on Native Hawaiians under 5F? Well, your description of OHA's money isn't exactly correct, but the point nonetheless is OHA is required under state law to spend the public trust revenue that it receives for the betterment of the condition of Native Hawaiians. We do not in any way concede that. I mean, dispute that. But in order for somebody to make out a violation of the Admission Act, they have to show a violation of federal law. What the state is required to do under the Admission Act, as interpreted in Price in 1990 as well as Price in 1993, where this court said whether the OHA trustees breached their fiduciary duties under Chapter 10 of Hawaii law is a matter of state law, but the state's obligation with regard to revenue is simply to spend more on public purposes than it receives. If the state misuses the land, then someone can bring a 1983 action because land isn't fungible. But in order to bring a 1983 action with revenue, a plaintiff has to show that the state, the state which is the trustee, is in breach. The only way the state can be in breach of the revenue provisions of the Admission Act is if it fails to spend more on Admission Act purposes than it receives in revenue. This court explicitly said in the Price case, the state is not like a private trustee. The state does not have to account for the way it receives and spends money. The state, the court said that the words public trust in the Admission Act with regard to revenue betoken the state's duty to avoid deviating from Section 5F's purpose. They betoken nothing more. Section 5F's purpose with regard to revenue is nothing more than requiring the state to spend at least as much as it receives in revenue on the purposes set out in the Admission Act. Since we spend 15 or 20 times what we receive just on public education, it is not possible that any individual plaintiff can demonstrate that we are violating the provisions of the Admission Act to protect a right protected by the Constitution or laws of the United States. This is a private right of action under 1983. The various permutations of state law don't form the basis of a federal cause of action under 1983. In order for a plaintiff to succeed, they have to demonstrate that the trustee, which is the state, has breached the trust. Again, the only way a plaintiff can demonstrate that the state has breached its trust with regard to revenue is by failing to spend enough money on the purposes. If the state law provided, for example, we will fulfill our duty under the Admission Act by spending at least as much on public education as we receive in revenue, there would be no question that we were complying with the Act since we have no duty to account dollar for dollar as it's fungible. We have no duty to trace. The fact that we don't have a statute that says that, but in practice, we spend 20 times what we receive on public education, the fact that we don't have a statute that says in order to fulfill our purposes under the Admission Act we're going to spend 20 times what we receive can't create a cause of action under Section 1983. Thank you, Mr. Bennett. I think we understand your position. Thank you, Your Honor. Thank you for your indulgence on the time. You're welcome. We'll hear some rebuttal, and we'll indulge it here, too, since the opposing counsel had some time. I appreciate it. I would like to first address, Your Honor, Judge Braver, your question about the only issue before the court is the four uses. That is not the only issue before the court as to whether or not these four uses are proper. We have asked for declaratory relief, and I submit that there is enough confusion in all of the cases and in the argument that we've heard as to what the proper use of these funds are that we need some declaratory relief, some guidance for the future. And if you take these cases case by case by case by case, well, this is okay and this is okay and this is okay, we don't get guidance. We need some guidance. What is the proper use of these funds? OHA wants to say that the proper use of these funds is we can spend it on Hawaiians, and if it provides an ancillary benefit for Native Hawaiians, that's okay. We want to say you need to spend it on Native Hawaiians, and if it provides an ancillary benefit to Hawaiians, that's okay. But the Attorney General has pointed out that under 5F, all they're required to do is spend it on one of the five purposes, that if there's any problem for noncompliance with Section 10, that's a state law issue. It's not a 1983 cause of action. The Attorney General is absolutely wrong. Well, that's the conclusion. He is absolutely wrong. He is ignoring Section 5B and Section 4 of the Admissions Act that requires the state to implement Hawaiian Homes Commission Act. That was made by the federal government into a state law. The Hawaiian Homes Commission Act is a state law under the Admission Act that the state is required to keep as part of the Constitution. They cannot ignore the Native Hawaiian. They cannot spend all of the money from 5F on schools. And in fact they don't, and in fact they don't because the income from the available lands is not included in this little exercise we have. So what they do is they take the income from the available lands and say that's all the support that we have for Hawaiian Homes. That's not what Congress intended, if you look at the big picture. Congress intended to implement that thing, and they did not intend that they should only have the income from the homesteads to support the homesteads. They intended to use all of this, more. And I think it was 20%. In the Constitution, the 1978 Constitution, they said there's 20%, 15 or something, there's a percentage in there that's supposed to be used for homesteads. That's not being done. That's not what we're arguing about. What we're arguing about is the portion that they say is going to OHA for this specific purpose. In Akaka, the court said the trust follows that money. It doesn't matter if the state is using money for the trust purposes over here because we're talking about trust money that's in OHA. So the fact that there's public schools for Hawaiians doesn't allow OHA to spend trust money on other purposes than the trust. Thank you, counsel. You've extended your time, and I think we understand your position. We appreciate very much the arguments of all the parties. They've been very helpful. And the case just argued is submitted, and we will take about a ten-minute break before the final case on our docket.
judges: Beezer, Graber, Fisher